Good morning, your honors. Carmen Smarandoyo. Smarandoyo. Okay. Ms. Smarandoyo, it's my understanding that you and Mr. Paulson will be splitting your time. That's correct, your honor. So I'm asking our court deputy to please place 10 minutes on the time for you. Additionally, if you would like to reserve time for rebuttal, you're in charge of doing that. And which one of you would be doing the rebuttal? I will be doing the rebuttal. And our plan, with your permission, is for me to spend about eight minutes on the facial challenge, my colleague to spend about eight minutes on the as-applied challenges, reserve four minutes for rebuttal, which I will handle. I understand that this is not easy to manage, but we'll do our very best to help the court. We appreciate that. And I also wanted to let you know that if you are in the middle of an answer and it goes into minute nine, perfectly fine. We won't count that against you. We appreciate that. Thank you. Okay. We are ready to go. Counsel, whenever you're ready to get started. Good morning, your honors. May it please the court, Carmen Smarandoyo from the Federal Public Defender's Office in San Francisco, on behalf of Mr. Martinez. We've gotten the housekeeping out of the way, so I will delve into the issues today. These consolidated cases deal with a very, I feel like I'm a bit too far away, maybe. Perfect. Deal with a unique statute. It is, to our knowledge, the only statute, aside from 922G1, that imposes a permanent lifetime deprivation of the Second Amendment rights. And it does so not based on felonies, not based on actual conduct, but it does so based on one single misdemeanor conviction for domestic violence. This statute we respectfully submit is facially unconstitutional, but at a minimum, it is unconstitutional as applied to our client's circumstances. Since these cases started a long time ago, we have had two important legal developments. We've had the Supreme Court decision in Rahimi, and most recently, we've had this court's decision on bank in Duarte. I will spend just one second on Rahimi, unless your honors prefer otherwise. I respectfully submit that the statute at issue in Rahimi, 922G8C1, is so significantly different than G9, both in duration and in the process, including the fact that it does not require a finding, a prospective, forward-looking finding of dangerousness, that the narrow dangerous tradition that Rahimi recognized does not apply to G9. And unless your honors disagree with that premise, I would like to focus on Duarte. Let me start out with that premise, though. That is to say, I see Rahimi in a sense as sustaining a statute based on less than what we have here in front of us, because Rahimi, all you need is a restraining order. You don't need any finding of actual criminal conviction. Here we've got a prior criminal conviction. I agree with your honor that in that sense, G8 requires less, but actually it requires more, because it requires that the judge make a finding that the person presents a credible threat to the physical safety of other people. Right, but does not require a finding of a physical finding sort of in perpetuity. All it requires is a finding of dangerous now, right? It requires a finding, and with your permission. Please, yeah, sure, sure. It requires a finding that a person presents a credible threat for the duration of the restraining order. Judges, when issuing the restraining order, domestic violence restraining orders, obviously have discretion as to the duration of that order. So for example, in Mr. Rahimi's case, it was two years. So what judges have to find is that the person would present a credible threat for the duration of the restraining order. So it is not about only presenting a danger today, but presenting a danger for the duration of the restraining order. So your point is then, under Rahimi, if that's how I pronounce it, as soon as the restraining order is lifted, then of course he can have the firearm again. That's correct, Your Honor. And here this is in perpetuity. This is in perpetuity. And this is the main feature of the statute that really sets it apart from G-8 and all other statutes, again, except for G-1, which pertains to a sui generis kind of analysis. And why can't Congress make a judgment, which in sort of my experience of the world, in many cases is going to be accurate, that someone who's got a conviction for a spousal abuse, there's a significant threat that this may continue, that whatever the personality characteristics of this person that led to the conviction are such that that just makes it a dangerous person. Your Honor, I don't disagree that such a judgment might be valid if appropriately limited. But to infer from one incident, from one conviction, for misdemeanor conduct, lifelong risk, that connection, that does not carry a rational connection, is very different, for example, if the statute look at the actual conduct, if it requires that kind of finding. But this assumption, this creation of a proxy of danger, lifelong permanent danger based on one incident, it does not, it's not supported by logic, and it is not supported by anything in what the government presented. And I will say this, Your Honor, we are now at a point of legal developments where actually Congress itself has recognized that this assumption of lifelong danger is not warranted. As Your Honors know, in 2022, Congress amended 922G9 to expand it to dating relationships. But for dating relationships, Congress also created this five-year limitation. So people who commit crimes of domestic violence while in a dating relationship are only subject to a five-year restriction, not the lifelong restriction that the other part of G9 provides for. And I can see an argument or a question that, well, it's about dating relationships. And that kind of distinction actually is irrelevant. Relationships between people are fluid, dating relationships become marriages, the other way around, marriages, people break up. But what's important about that amendment is that Congress recognized that not all means that this assumption of lifelong risk is actually unwarranted. And it is so by only providing for a five-year limitation in that context. You're bounded on the other side by Duarte. So we've got lifelong with respect to any felony punishable by more than one year. That's correct, Your Honor. So how do you deal with that one is to say there are a lot of, they call them felonies, but some of them are pretty, if I can say it this way, minor. And that one lasts for a year and that's our en banc. So how do you get out from under that one? Well, I'm hoping to get out of it by referring to Duarte's rationale. Duarte upheld G1 based on Congress's judgment that felons present a heightened risk of misusing firearms. But he did so in conjunction with the historical tradition of punishing felonies, other founding with capital punishment and forfeiture of the estate. So according to it's not based on an assessment of danger in the sense of, you know, finding like based on findings or the elements of the offense, but on the fact that the mere fact that legislatures can punish these offenses with capital punishment means that they're just so very serious that the lesser punishment of lifetime disarmament is constitutional. And I don't know if that quite answers your question, but all felonies are the founding or punishable by death. And because all felonies are punishable by death, then G1 is constitution, all its applications. I apologize. I do have one quick question. I know your time is running low. Does it matter that someone who is convicted under 922 G9 can try to regain their right to firearms by setting aside their conviction, seeking a pardon, all of that? The answer is no, Your Honor. Second Amendment is a constitutional right and constitutional rights should not depend on the grace of the executive or the courts if the mechanism provided for that relief, if it is the courts. So the fact that some people might end up with a lesser restriction is irrelevant to the statute that provides for this permanent prohibition. In practice, too, these exceptions are illusory. And the 925 C process, which has existed on paper but not in reality for decades, is another good example of that. And I am running low, so with your Good morning, Ma'am. Police of the Court Dan Polson, Assistant Federal Defender. I want to pick up where Your Honor just left off, which was, you know, is this truly a lifetime prohibition on possession of firearms? And the answer is yes. And there's a couple of reasons. One, and especially with Alaska law, the statute provides that a conviction that has been set aside, expunged, or if you've received a pardon, that that can't be a disqualifying offense. Alaska does not provide a procedure for people to get their firearm rights restored because Alaska doesn't prohibit people convicted of misdemeanor domestic violence offenses from possessing firearms. So at the state level, there's no mechanism for getting your firearm rights restored. Getting your conviction expunged or set aside, those are not realistic options. Getting a conviction set aside is not an option in Alaska because that's only available for crimes, it's not available for crimes against the person. So if you have a misdemeanor crime conviction for assault, you can't get that conviction set aside. Pardon, I think, is, as my colleague just said, an illusory option. This statute is unique, I think, in many respects from any of the other statutes that this Court has considered prohibiting possession of firearms, as well as the historical analogs that the government has cited, in that it is imposing a permanent lifetime disability based on misdemeanor conduct. I have not heard the government cite a single example of a lifetime prohibition that is attached to a misdemeanor offense where there is not contemporaneous findings that the person is presently, presently poses a risk of injury to others. So the key features about this law is that it's looking backwards. It's saying that, well, you committed a domestic violence offense at some point in the past, you were then presumptively unable to possess firearms lawfully. The circumstances of our individual cases, I think, call into sharp relief how flawed that assumption is. In the case of Mr. Padgett, this is a gentleman who lives in Cake. He lives in the bush in southeast Alaska. There's a nuisance bear that's coming repeatedly into his backyard. It's terrorizing his family. He exercised his Second Amendment rights to kill that bear. I don't think our founding fathers and mothers would have begrudged him for making that choice. The only reason why he was prohibited from possessing a firearm is because of a 2010 conviction, an 11-year-old conviction for a misdemeanor crime that did not involve firearms. Counsel, how can an as-applied challenge be squared with the holding in Duarte with regard to felonies of a categorical approach rather than looking at individual circumstances? Excellent question. So the thing about Duarte is that it was analyzing 922G. The analytical approach that this court adopted was to see how has our nation's history, I'm sorry, how has our nation regulated felonies? And it was pretty clear that historically our nation has attached certain lifetime prohibitions for persons who are convicted of felony offenses. You cannot make the same argument with respect to misdemeanors. And I want to touch on something that was brought up in Duarte. Duarte said, well, you know, we make these really broad classifications. We see examples like the tramp laws that say, you know, these 19th century tramp laws that said that a person can possess a firearm if they were a vagrant, basically. And the court said, well, you know, 922G1 is in keeping with this tradition. That analogy really doesn't work in 922G9. And the reason being, you know, the tramp laws are basically based on a finding that the person is a tramp, that they are somebody who cannot be trusted to possess firearms safely. You know, in the case of 922G9, there's this presumption that because you committed an act of domestic violence at some point in the past, you are forever a batterer. That's not the case. And our position is that this court should find that this law is unconstitutional as applied to defendants absent a showing by the government that the individual is a danger, that they do pose a threat to others. So our position is that I think the most prudent approach is, assuming that this court doesn't find that the statute is unconstitutional facially, is to say that, you know, the defendants should have an opportunity, or I should say, the government should have the burden of proving that they are persons who, in the case, to borrow the term from Rahimi, that they pose a credible threat of injury to others. Now, obviously, that's a fact-specific approach. The Seventh Circuit used sort of a similar, they did something similar in the case of United States versus Williams. They were looking at 922G3, a prohibition on possession of firearms by people, you know, who are users of unlawful, unlawful users of controlled substances. And that case involved a gentleman who was deemed to be unqualified, disqualified because he was a user of marijuana. And the court said, we're really not sure that we can say that this person is the kind of person that historically would have had their Second Amendment rights stripped. Therefore, they remanded to the district court to make that finding in the first instance. And I think that would be the most prudent approach in this case. Counsel, what are we to do in situations where the only reason it was a misdemeanor isn't because the violence itself wasn't horrific. It's because that's the only thing they could charge them with because, I don't know, the victim was recanting or the victim didn't want to testify. I mean, as you know, those types of cases are very difficult to bring through the court system. Yeah, yeah. And I acknowledge that domestic violence offenses are incredibly difficult for many reasons, from the government side and from the defense side of things. But the fact is that there's no real shortcut. There's no way of shortchanging the Second Amendment. And I think the problem, and I think Congress was, the problem behind this law is that it was resting on an unfair assumption that in every case there must be something more beyond the fact of the person's conviction. But unfortunately, this law is based on just the fact of the prior conviction. And we know that. Let me ask you this. This is obviously not the case as we have it or the cases as we have them. What if Alaska had passed a statute or California passed a statute that said punishment for conviction for domestic violence is misdemeanor with whatever punishment in terms of fine or maybe some imprisonment, and as part of the punishment, loss of right to possess a firearm. What if that was in the criminal statute? Would that be constitutional? I don't think that you can. I think that would still fall victim to the challenge that we're making, which is, is there precedent for attaching? And I don't know if you're imagining like a lifetime prohibition. I am. I'm the same duration of probation we have here in front of us. Yeah. And I would say that would still run afoul, I think, of the history and text standard that the court laid out in Bruin. Now, understand that we're not disagreeing that there aren't good policy reasons for trying to create a more inclusive standard. The problem is that under Bruin and Rahimi, this, you know, the government's burden is to show that this is consistent with our nation's, you know, history of firearm regulation. And like I say, you can't find an example other than 922 G9 where a misdemeanor conviction, whether it's domestic violence or anything else, has triggered a lifetime prohibition. That's just not something that was done. That's not something that, you know, the framers would have recognized. Yeah. I'm going to proceed with some other aspects of this. Again, this is a permanent lifetime prohibition, notwithstanding the exceptions that the government has highlighted. The regulations that the government cited in their 28J letter, I think, are very revealing in that there is a concession there that not every person who is convicted of a misdemeanor crime of domestic violence is going to have a proclivity for misusing firearms. Not every person convicted of a misdemeanor crime of domestic violence is going to pose a risk of using violent physical force against people in the future. I think that is an important concession in this case. But risk is really difficult to deal with. You look at someone who may or may not be at risk, you may say, well, you know, 80 percent risk, 90 percent risk. That means that 20 or 10 percent of the people won't do it. But how do you distinguish between, in advance, who's going to be dangerous and who's not? Well, the nice thing is that we know that in the case of like the surety statutes that the government has cited, but also the decision making that judges make all the time when they're deciding whether or not to release somebody on bail or when they're fashioning conditions for a protective order. Judges are pretty good at making those factual determinations. But the statute is premised upon, you know, we don't want to take a chance. We understand that people, some of these people may be perfectly safe, but a lot of them are not. And we don't want to leave it to the judge based upon limited resources. But every possible intelligence, I mean, you know, people are people, you do your best, but you're going to make a mistake. And the judgment in the statute is we don't want to risk it. And again, that's a that's a policy choice. I mean, that's a policy choice. And the question is, why is it an unconstitutional policy choice? Because, as the Supreme Court said, we are tying the if we allow the Second Amendment to be whittled away based on, you know, judges, you know, based on facts and circumstances that fall outside of this nation's historical practice and tradition. But you're suggesting that somehow it's within the historical tradition for the judge to make that decision. It certainly is. It actually is. And I think that that's the that's what we see in the surety statutes that the government keeps citing and that this court relied on in Duarte and what the court relied on in  And again, the features of the of that historical practice, I think, is there's really no comparison between that and what we're dealing with in 922 G9. Thank you. Ms. Chan. May it please the court. My name is Mary Jean Chan, and I represent the United States in these consolidated appeals. This court should join the five circuits that have unanimously upheld 922 G9 as facially constitutional under the Second Amendment. As the Fourth Circuit held in Nutter, the 922 G9 statute squarely falls within the tradition identified by the Supreme Court and Rahimi of disarming those who present a threat to others, a physical threat to others. The as applied challenge should also fail. And this court should find that misdemeanor by misdemeanor challenge is not available in the G9 context, just as it found in Duarte that felony by felony challenge is not available. In any event, the application of G9 to each of these defendants, Martinez, Rino, and Padgett at the time of their offense conduct comports with the Second Amendment. So I would like to first start off with talking about why G9 falls so squarely under Rahimi, just as G8C1 does. So my friend on the other side talked about two differences, differences between potentially between G8 and G9, one being the temporary nature of the ban and one being whether there's legislative findings as opposed to judicial findings. And I want to say that just as the Fourth Circuit in Nutter found and actually also in Tenth Circuit in Jackson found, those really are not significant differences. First, in terms of the temporariness of the ban. As my colleagues sort of conceded, G9 explicitly has provision under 921A33C that allows for a five-year ban only for certain kinds of prohibitions. So on a facial challenge, that should be enough. That sort of settles it. But in any event, the other parts of the statute are not necessarily permanent either. They are maybe presumptively, but that is because they're calibrated to the duration of the risk. That is that if a defendant can prove, and this is usually the standard for expungement processes and pardons, that they are not a threat anymore, that they are on good behavior, that they are law-abiding, then that is sort of the prerequisite for the expungement pardon processes as well as the 925C process that has been recently revitalized. So it is calibrated to whether they are a risk. And yes, the presumption is that they are a risk because it is based upon conduct that led to a misdemeanor conviction, where we all know from empirical evidence, and I think my colleagues concede, these kinds of convictions are actually very difficult to actually prove. And sometimes they are just the tip of the iceberg because they're notoriously underreported and they're difficult to prove unless you have some sort of visible scarring or something from the action, which we do in many of these cases. We had a witness, well, we had actually, you know, in the Padgett case, really on multiple occasions, lacerations on the neck because Mr. Padgett was strangling the multiple women in the four cases that he was convicted of misdemeanor crime of domestic violence. Mr. Rino had situations too where he had, there were witnesses sometimes who were called in. He had stabbed the garage door with a screwdriver where there was an infant involved. He had held a gun and wielded a gun and threatened to kill himself and others in some of the domestic violence cases that he was convicted of. And Martinez too, although he, it was perhaps, you know, not quite as dramatic. He pushed the mother of his newborn child, just two months old, with enough force that she was frayed for her safety and brought in the police. And there was a conviction there. And in that situation was a little bit fraught too, because Mr. Martinez then ran from the police and essentially said, if you lay hands on me, it's going down and threatened the police in that encounter too. And of course, the threat to the law enforcement officers who are called in to service calls with this domestic violence is incredibly dangerous as well. And we know that from just this week, the news that two officers in Pennsylvania were killed when they were responding to a stalking. And that's not in the record. So I should excise that from this. But these are dangerous situations and Congress recognized this. So the temporary duration, I think that is sort of settles that or hopefully sort of explains why the Fourth Circuit had found that it is actually not a permanent ban. It may be sort of presumptively permanent, but it's not per se permanent. Counsel, can you address what your friend on the other side said about Alaska, that in Alaska, the state doesn't have any remedy for someone to try to expunge their record? I'm not an expert of Alaska law, but Alaska statute 12.55085E and F3 allows for the setting aside of a conviction, which is discharging without imposition of sentence after suspending imposition of sentence upon conditions. If there are circumstances in mitigation or it serves the ends of justice, that doesn't apply if you have a conviction of 11.41230, which is the fourth degree assault here and one or more prior convictions for a certain kind of misdemeanor or felony. So it is true that it is not available, I think, for defendants Paget and Rino at this point, but it was available to my reading of Alaska statute at some point, perhaps after their first misdemeanor. But of course, each of them has multiple misdemeanors over the years. And the offense conduct here, at least for Rino, only occurred within two years of his most recent conviction for misdemeanor crime of violence. Just returning to the judicial findings, too, I would like to sort of point out, too, that G9 is very similar to G8 in the sense that they are predicated on individualized determinations as to a particular defendant by a court with badges of due process. In the G8 context, this can be by clear and convincing evidence. It can be evidence or some testimony that somebody is afraid of threat in the future going forward. What you have in the G9 context with the conviction is that there has to be a finding of past conduct, completed conduct, that there was use or attempted use of physical force or the threatening with a deadly weapon against a particular type of a person where there is a relationship between the victim and the perpetrator. Now, again, the Supreme Court in Hayes explained that the relationship doesn't have to be implicit in the state misdemeanor, for example. It can be something that's proven in the context of the G9 prosecution. And so I think that's an important point for a number of reasons. First of all, you have the independent judicial findings. And yes, there isn't sort of the inference, the final inference that this presents a future critical threat. But it's infinitely, I think, reasonable. It's a very small bridge or inference that the Congress made, the legislature made and find that where there has been actual conduct, this kind of conduct, that that is an unacceptable risk, as was stated by Senator Lautenberg in the amendment process, in the legislative process of going forward that there will be a risk. And, of course, that can be rebutted, perhaps shown. But it is something that is just an inference that they have made that is not a very far bridge. How much do we have in the legislative history that tells us that when Congress enacted this particular provision of the statute, how difficult it is or how rare they actually are, these convictions for domestic violence? And therefore, we should treat these convictions for domestic violence as sort of the tip of the iceberg or as particularly deprobative? How much legislative history supports what we seem to have had more or less as common knowledge as we're talking here? Well, I think Castleman is where the Supreme Court has set out quite a bit of the legislative history. And that, I think, focuses on the recidivism, the empirical evidence of recidivism. And it talks about how these are very difficult prosecutions because you oftentimes have these intimate relationships. And so I don't know that the legislative history has any senator specifically saying this is just the tip of the iceberg. But there is certainly a concern that when somebody has been convicted of this, that this is a very strong sign that this will happen again and that it is difficult in these cases for sometimes the victims to testify. First of all, these things happen in private, in the private domain. And there's not oftentimes any witnesses other than the victims who are emotionally and materially intertwined with the perpetrator, who is oftentimes a spouse or a parent or a guardian. How do we deal with the notion that's clearly sort of on the table here in our discussion with people who might no longer be in a domestic relationship? There's no longer, therefore, any danger of them engaging in domestic violence because they're not in a relationship that would produce it. And they're in a situation, I'll just imagine one that's similar to one of the defendants in this case, where, you know, they might want some sort of a firearm against bears or some other danger. What do we do with that person? I mean, how do we justify applying the ban to that person? Well, first of all, I would say that domestic relationships have changed over time. So, for example, Mr. Padgett throttled multiple women. It wasn't just a single person. He moved from one to the other. And it does appear that now he just lives with his grandmother and maybe his grandmother is not in a position to report in the same way. So, but assuming that he is now just wanting to have a gun because he needs it for self asked for permission and sued for an injunction on that before he just went to self-help and obtained a firearm. And here what you have in this case is Mr. Padgett, who obtained a firearm. He knew he wasn't supposed to. He was told within a year by ATF, I believe, that he was not allowed to have access to firearms because of his misdemeanor. He went and used it. And then it is true that there are certainly, I think, compelling reasons for self-protection. But in this case, he shot the bear in a residential area off season. So he was not supposed to do those things. And it is not clear that there was anybody there that was threatening him or the bear was threatening him at that time. He could have also gone and sought help from, for example, the officers and said, there's a bear that's on my property. So there are, I think, procedures by which a person can go and help themselves in these situations. There are situations where they may be able to sort of, again, as in the range case, sue for it instead of just availing themselves of a firearm and, in this case, shooting it in a way that was obviously lethal to the bear in a place that might have been quite risky when he was not supposed to, not having made any showing. And so on the as-applied portion of it, I think that the badges of kind of violence or risk were actually pretty obvious with actually all three of the defendants. And this is based upon the time at the time when they obtained the firearms. For example, Martinez didn't just have one firearm. He had an arsenal of firearms and they were in easy access, unsecured among four minor children in his residence. That, I think, is risky behavior. There was also drugs and other indicia of gang activity. So this is not somebody who I think we are, I think, assured does not present a physical threat to others. Mr. Rino, just, I think, within two months of obtaining a firearm, had been told not to have enough firearm. He had been found before the felony sort of offense conduct here, running into a woman's yard with a firearm trespassing, they called on it. He had been in a fight. And Mr. Padgett, similarly, had also been in fights. And so these are not people who at the time of the offense conduct had many, I think, were law abiding and many signals that they were not physical threats. And if you also look at the offense conduct that underlay the misdemeanor convictions, those are obviously violent too. I don't have to sort of rehash that we have, but the record, I think, shows that those were difficult situations. The recency is also quite recent. Of course, we have 11 years for Padgett. But again, with Rino, it was about two years. Although, because these are lifetime bans, at some point, it's not going to be recent. That is to say, you know, the underlying conviction may be when the man is in his 30s and he's still banned when he's in his 80s. But for the as applied challenge, I think that we are looking here. And for the facial part of it, I mean, they have the opportunity through these different mechanisms to make those bans no longer permanent at that point. Well, that may not be true in Alaska. Well, now 925 C allows for that to happen in terms of relief, not in Alaska, per se, but for the purposes of federal prosecution under 922 G9, certainly. In fact, I think the proposed rules provide for a sort of presumptive kind of tenure period of time, which is not an insignificant amount of time, but it's not permanent. And so I think that that should hopefully assuage the court's concerns about the temporary nature of it for both the as applied and also the facial challenges. And I just want to kind of go back and emphasize or address the as applies or reproach that has been proposed by the defendants, which is to say, listen, the misdemeanor convictions here do not require something that is actually violent and they can be premised upon just a reckless state of mind. Now, granted, the California conviction at issue here actually required willfulness because of battery. But it is true that recklessness was enough for the fourth degree assault in Alaska. And they've argued that that means that takes it out of the ambit of the Second Amendment. But I want to sort of point out that that argument is completely untethered from the historical tradition approach that is mandated by Bruin. There's nothing in the shorty laws or the afraid laws that say that the only risk there's risk when it is the highest level of risk or suggesting that the parameters of what a proper conviction that would be a predicate are would be based upon essentially the parameters of the Armed Career Criminal Act from 1984, which is certainly not the founding. So I think that those sort of approaches are really they are not really based on the historical approach that has been required. And then again, I would urge this court to adopt what it did in the Duarte case with respect to felonies and to find that misdemeanor by misdemeanor challenge is not appropriate to the extent that there are concerns about a particular misdemeanor that is, I think, taken up properly under a sufficiency challenge. And there is no sufficiency challenge here. Martinez stipulated that he had a qualifying misdemeanor. Mr. Paget and Mr. Vino also admitted to it as part of their plea agreements. Counsel, with regard to Bruin and the exercise that Bruin mandates in a circumstance like this for us to identify historic analogs, can you suggest a meaningful test that we should apply or might apply in identifying the sufficiency or similarity between the statute in question and any historic analog? I think that Rahimi is the best way to kind of think about what is close enough, because the Supreme Court has not explained exactly how far something has to be. And what they have said is that G8C1 is similar enough to the Shorty and Afray laws that even though they're not historical twins, they are historically analogous. Sounds more like intuition than a meaningful sort of test that we might apply, right? No. I think that what we're looking at is how similar they are. So, for example, with respect to the sort of the why, the meaningful why, and the why here, I think, is all the same, which is to prevent people from who are threats to others from becoming much more lethal by having firearms. And so the why, I think, is the same here in terms of the how and the burden, what the Supreme Court said was, well, if you look at the historical regimes, you have situations where there were individualized findings as to particular individuals by a court where there was some due process given to them. And then there was some kind of calibration between the sort of the disarmament and that threat, the finding of a threat. And so if you have something that is similar to that, and the Supreme Court found that 922G8C1 is similar to that, then that fits within that regime and is analogous. And so I think that this court should find that G9 is very similar to G8 in all those respects, and therefore also very similar and fits within the historical regime identified in Rahimi. For other kinds of statutes, the court has looked at different kinds of historical traditions. So, for example, in the Duarte and the 922G1 context, the court has referred to Rahimi, but also relied on a different historical tradition, which is the legislative authority to categorically designate a class of people as dangerous or of special danger of misuse of firearms. And for that purpose and on that basis to then disqualify them. And then found that felonies are serious crimes. 922G9 is also a serious crime, even though it hasn't gone by the name felony per se. It's defined in G9 and through 921A33. So it's a quasi felony in a sense. It's a serious crime. But so it can also fall in Duarte. And a number of the circuits that have upheld 922G9 have referred to both and relied on both the tradition identified in Rahimi and also the one that has been identified in the G1 cases. And in combination, found that that to be sufficient. I think that this court doesn't have to rely on the second tradition. I think it can rely purely on Rahimi and not on the second tradition. But if it is concerned and it wants to bridge the gap, the tradition identified in the G1 cases and in Duarte should help cross that T. If the court has no further questions, we ask for an affirmance in all three of these cases. Thank you. Thank you. Thank you, Your Honors. Give me one second, counsel. We can go ahead and put four minutes. Okay, go ahead. I would like to address some of the questions that you targeted to my colleague. And I will start with the legislative history for this particular statute. It is true that when Congress originally thought about enacting the statute, was it meant to focus on the most serious domestic violence offenders. That is not a statute that Congress actually enacted. And it is not a statute that exists today, especially after the Supreme Court's decision in Castleman and Voisin. First of all, the statute, despite Congress's intent, it chose not to rely on the underlying conduct, but instead to employ this categorical approach. And furthermore, the Supreme Court took that statutory language and then said, you know, the statute, the underlying conviction does not even have to require a violent force. Offensive force, common law force suffices. And then came Voisin, which said, you don't even have to have intentional force. Recklessness or even negligent force suffices. So the statute as it exists is very far afield from what Congress initially envisioned. Second, you asked, Judge de Alba, you asked and correctly pointed out that indeed in some cases, the underlying conduct will be very serious, will rise to the level of felony. And again, that is not, that's not how Congress chose to read the statute. But even assuming that we can consider that, it is at most a reason to reject a facial challenge, but not to uphold the statute in its entirety. And I will point this out about as applied changes, because I was a bit confused about whether the government now concedes that they should be appropriate or not. All the other circuits, four of them, except the Second Circuit, actually have even left, have either left open the idea of as applied challenges or expressly consider that, saying, well, this kind of argument is actually appropriate for an as applied challenge. So this idea that the other circuits have upheld the statute in total without any kind of allowance for as applied challenge is not accurate. The Second Circuit is the only appellate court to go that way. We have talked quite a bit of what's going on with our clients' cases and if they actually had a way to lift their restrictions. 925C, it is still a proposal. It has been ineffectual for decades. It is still in that stage. So our clients have never had that opportunity. My colleague reassures me that Mr. Reino and Mr. Paget under Alaska law did not have the opportunity to lift, to employ any kind of state remedy to lift the farm restrictions. And I have also provided your honors in my brief with a relevant California law. In California, even assuming that somebody obtains an expungement, that expungement does not actually come with restoration of firearms rights. So we are dealing with lots of misnomers and incomplete understanding of state law. But the conclusion is that our clients have not had this opportunity so far. And to just conclude with Duarte, your honors, because I think it is the one case that you have to contend with. I would really urge you to read our 28-day letter on United States v. Stenerson. United States v. Stenerson is the first published decision that applied Duarte and upheld both G3 and 922N. Counsel, you are over time. So go ahead and I'll give you five more seconds. But it did not do so based on this absolute right of legislatures to declare categories of people dangerous. They did so based on that judgment plus the historical tradition that actually supported the two regulations. And with all due respect, no such historical tradition exists as the G9. Thank you. Thank you. I'd like to thank both counsel. Did an excellent job today. The matter is now submitted. And this concludes our arguments for this morning. Thanks again to the counsel and for our court staff for their wonderful job. Thank you, everyone.
judges: FLETCHER, ALBA, Pitman